IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

VIRGINIA ANIMAL
OWNERS ALLIANCE, *et al.*,
     Plaintiffs,

     v.                                Civil No. 3:20cv633 (DJN)

MARK HERRING, *et al.*,
     Defendants.

## MEMORANDUM OPINION
### (Granting Motion to Dismiss)

Plaintiffs Virginia Animal Owners Alliance (the "Alliance") and Theresia Connell ("Connell") (collectively, "Plaintiffs") bring this action against Virginia Attorney General Mark Herring ("Herring"), Paul Kugelman ("Kugelman") and Michelle Welch ("Welch") (collectively the "Defendants"), alleging violations of 42 U.S.C. § 1983 and the Fourth, Eighth and Fourteenth Amendments to the Constitution. This matter comes before the Court on Defendants' Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure (ECF No. 19) as well as Rule 12(b)(6) (ECF No. 23). For the following reasons, the Court hereby GRANTS Defendants' Rule 12(b)(1) Motion (ECF No. 19) and DISMISSES WITHOUT PREJUDICE Plaintiff's Amended Complaint (ECF No. 13). Accordingly, the Court DENIES WITHOUT PREJUDICE Defendants' Rule 12(b)(6) Motion (ECF No. 23).

## I.      BACKGROUND

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint. A defendant moving for dismissal

for lack of subject matter jurisdiction may either attack the complaint on its face, asserting that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," or, as here, may attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White v. CMA Const. Co., Inc.*, 947 F. Supp. 231, 233 (E.D. Va. 1996) (internal citations omitted). As explained below, the parties maintain a factual dispute over the extent to which Welch participated in the seizure of Connell's animals. Importantly, resolution of that dispute determines whether Connell has Article III standing to bring a claim for money damages against Welch. As such, the Court accepts the factual allegations of the Amended Complaint as true, except to the extent that they relate to Welch's role in the search and seizure of Connell's animals.

### A.    Factual Allegations.

The Alliance, an organization of zoo owners, farm owners and pet owners, seeks to "educate the public and inform state lawmakers about the needs of zoo and pet owners," "ensure accountability for the state agencies that affect them" and "make certain that animal owners' due process rights are protected." (First Am. Compl. ("Am. Compl.") (ECF No. 13) ¶ 12.) The Alliance boasts members from throughout Virginia, including some of the largest private animal owners in the state. (Am. Compl. ¶ 36.) As part of its mission, the Alliance has spent significant resources — including over $10,000 — lobbying and educating lawmakers. (Am. Compl. ¶ 51.)

Connell owns a farm in Charles City County, Virginia, and is a registered member of the Alliance. (Am. Compl. ¶ 13.) Herring is the Attorney General of Virginia and Welch, as a Senior Assistant Attorney General, serves as the Director of the Office's Animal Law Unit.[1]

---

[1]    Plaintiffs have stipulated to the dismissal of all claims against Paul Kugelman. (Pls.' Resp. to Defs.' Mot. to Dismiss First Am. Compl. Pursuant to Rule 12(b)(1) ("Pls.' Resp.") (ECF No. 29) at 4.)

(Am. Compl. ¶¶ 14, 16.)  Plaintiffs allege that local Commonwealth's Attorneys widely regard Welch as the expert on understanding and enforcing Virginia's animal laws.  (Am. Compl. ¶ 16.)

In January 2015, Herring announced the creation of the Attorney General's Animal Law Unit ("ALU").  (Am. Compl. ¶ 20.)  The ALU "assist[s] with the prosecution of violations of the Commonwealth's animal fighting, abuse, neglect and other animal-related criminal laws and advise[s] on legal matters relating to animals."  (Am. Compl. ¶ 15.)  However, the power to initiate an investigation or prosecution remains with local agencies and the ALU becomes involved only upon request from a Commonwealth's Attorney or a law enforcement agency.  (Am. Compl. ¶ 21.)

Since 2018, Connell has owned Independence "Fun"ie Farm.  (Am. Compl. ¶ 55.)  The forty-acre farm operated as a "farming high school," offering a home school alternative that engages students through hands-on farm work and STEM-focused independent studies.  (Am. Compl. ¶ 56.)  Additionally, the farm sold naturally raised goat meat and milk and produced honey.  (Am. Compl. ¶ 56.)

On June 13, 2019, officials with the Charles City County Sheriff's Office executed a search warrant for Connell's farm pursuant to Virginia Code § 3.2-6568.  (Am. Compl. ¶¶ 63, 65.)  The officials told Connell that her farm had inadequate fresh water for the animals, despite the fact that Connell maintained tanks containing approximately 450 gallons of fresh water on the property.  (Am. Compl. ¶ 67.)  During the search, Connell "heard a State official, believed to be [Welch], talking to an officer over his radio."  (Am. Compl. ¶ 69.)  "The State official was irate and demanded that [the officer] seize the animals on the property."[2]  (Am. Compl. ¶ 69.)

---

[2]     As detailed below, Defendants lodge a factual attack on the allegations relating to Welch's involvement in the search of Connell's farm and subsequent seizure of her animals.

Ultimately, state authorities removed and impounded horses, ponies, goats, sheep and a donkey from the farm.  (Am. Compl. ¶ 60.)  Before June 13, 2019, Connell had not received any notice or warning that officials might seize her animals.  (Am. Compl. ¶ 59.)

About a month later, Connell attended a hearing in general district court to determine whether she had violated state laws relating to the abuse and neglect of animals.  (Am. Compl. ¶ 74.)  The court conducted the hearing under the authority of Virginia Code § 3.2-6569, which sets forth a procedural mechanism by which a general district court adjudicates whether an animal owner should retain custody of animals seized pursuant to Virginia's animal cruelty laws.  (Am. Compl. ¶ 74.)  During the hearing, multiple witnesses — to include a veterinarian — testified that the animals were malnourished.  (Am. Compl. ¶ 75.)  In her defense, Connell averred that a series of factors (e.g., a heavy rain that wiped out grass in her pastures) had resulted in the animals' malnourishment.  (Am. Compl. ¶ 76.)  Ultimately, the court ruled in favor of the Commonwealth and, because Connell could not afford a $9,000 appeal bond imposed pursuant to § 3.2-6569(F), she did not appeal the decision.  (Am. Compl. ¶¶ 77-78.)

In a separate proceeding thereafter, a jury found Connell guilty of six misdemeanor animal cruelty charges.  (Am. Compl. ¶ 80.)  Her sentence required her to pay $200 in fines per animal, but did not impose any jail or prison time.  (Am. Compl. ¶ 82.)  Connell does not presently own animals, but "intends to again own animals on her farm" "[i]n the future."  (Am. Compl. ¶ 85.)

### B.    Plaintiff's Causes of Action.

Plaintiffs originally filed their Complaint on August 14, 2020.  (ECF No. 1.)  Defendant Kugelman then filed a Motion to Dismiss (ECF No. 5) on October 6, 2020, and, on October 27, 2020, Plaintiffs filed their First Amended Complaint (ECF No. 13).  The First Amended

4

Complaint added Herring and Welch as defendants.  Plaintiff sues Herring in his official capacity and Welch in both her official and individual capacities.  (Am. Compl. ¶ 14, 16.)

Plaintiffs bring constitutional attacks against two Virginia statutes:  §§ 3.2-6568 and 3.2-6569 (the "Animal Cruelty Statutes").[3]  (Am. Compl. ¶ 1.)  Broadly speaking, § 3.2-6568 authorizes a search warrant of an individual's property when reasonable cause exists that animal cruelty is taking place.  (Am. Compl. ¶ 3.)  Section 3.2-6569 outlines the procedure for seizing and impounding abused or abandoned animals, which procedure includes a post-deprivation hearing within ten business days after the seizure.  (Am. Compl. ¶ 4.)  Additionally, § 3.2-6569(F) permits a locality or court to require the owner of an impounded animal held for more than thirty days to post a bond in surety with the locality to offset the cost of caring for the animal.  (Am. Compl. ¶ 4.)  Plaintiffs allege that, in practice, an animal owner must pay the bond before appealing a decision from the general district court.  (Am. Compl. ¶ 4.)

In Count I, Plaintiffs bring a claim for declaratory and injunctive relief, alleging that §§ 3.2-6569 and 3.2-6569(F) violate their due process rights under the Fourteenth Amendment to the Constitution.  (Am. Compl. ¶¶ 91-94.)  Plaintiffs contend that by requiring an animal owner to pay a bond to appeal the trial court decision, § 3.2-6569(F) "permits the State to deprive owners of significant property while denying them an appeal of the trial court decision."  (Am. Compl. ¶ 94.)  In Count II, Plaintiffs again assert a claim for declaratory and injunctive relief. (Am. Compl. ¶¶ 95-99.)  There, Plaintiffs allege that §§ 3.2-6568 and 3.2-6569 violate the Due Process Clause of the Fourteenth Amendment, because they allowed the government to raid Connell's farm and seize her animals without a pre-deprivation hearing.  (Am. Compl. ¶ 97.)

---

[3]     Plaintiffs have stipulated to the dismissal of all claims as they relate to Virginia Code § 3.2-6507.  (Pls.' Resp. at 4.)

Moreover, Plaintiffs allege that § 3.2-6568's requirement of "reasonable cause" proves an impermissibly vague legal standard. (Am. Compl. ¶ 99.) As for Count III, Plaintiffs bring another claim for declaratory and injunctive relief, this time asserting that § 3.2-6569(F) violates the Eighth Amendment's Excessive Fines Clause. (Am. Compl. ¶¶ 100-03.)

In Count IV, Plaintiffs ask the Court to declare the Animal Cruelty Statutes unconstitutional and to enjoin Defendants from enforcing them. (Am. Compl. ¶¶ 104-05.) Finally, in Count V, Plaintiffs bring an as-applied challenge to § 3.2-6569, alleging that the application of the statute to Connell violated her rights under the Eighth and Fourteenth Amendments by effectively denying her the ability to pursue an appeal of the general district court's decision.[4] (Am. Compl. ¶¶ 106-07.)

From these allegations, Plaintiffs ask for a declaration that the Animal Cruelty Statutes violate the Constitution, an injunction enjoining Defendants from enforcing them, unspecified compensatory and punitive damages, and attorneys' fees pursuant to 42 U.S.C. § 1988.

**C.      Defendants' Motion to Dismiss Pursuant to Rule 12(b)(1).**

On November 23, 2020, Defendants filed their Motion to Dismiss Plaintiffs' Amended Complaint Pursuant to Rule 12(b)(1) (ECF No. 19), moving the Court to dismiss the First Amended Complaint (ECF No. 13) for lack of jurisdiction. In support of their Motion, Defendants argue that Plaintiffs lack Article III standing.[5] (Mem. in Supp. of Defs.' Mot. to

---

[4]      The Amended Complaint also contained a Count VI, which challenged § 3.2-6568 as violative of the Fourth Amendment. (Am. Compl. ¶¶ 108-11.) However, Plaintiffs have since stipulated to the dismissal of all claims that arise under the Fourth Amendment. (Pls.' Resp. at 4.)

[5]      Defendants also argue that other jurisdictional bars warrant dismissal of this lawsuit — i.e., Eleventh Amendment sovereign immunity and absolute prosecutorial immunity. (Defs.' Mem. at 16-19, 21-22.) However, because the Court holds that Plaintiffs lack standing, the Court does not address those alternative arguments.

Dismiss Pls.' Am. Compl. Pursuant to Rule 12(b)(1) ("Defs.' Mem.") (ECF No. 20) at 7-16.) To

that end, Defendants first argue that Connell lacks standing as an individual plaintiff. (Defs.'

Mem. at 9-11.) Specifically, Defendants contend that Connell cannot satisfy the injury-in-fact

prong of the standing analysis, because she fails to show that "she is 'immediately in danger of

sustaining some direct injury' as the result of any official's challenged conduct." (Defs.' Mem.

at 10 (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983)).) To support that argument,

Defendants emphasize that Connell does not presently own animals on her farm. (Defs.' Mem.

at 10.) Additionally, Defendants urge that Connell fails to "fairly trace" her injury to

Defendants' alleged conduct. (Defs.' Mem. at 11.) On that front, Defendants provide an

affidavit from Welch in which she denies having ordered the seizure of Connell's animals. (Ex.

1 to Reply Mem. in Supp. of Defs.' Mot. to Dismiss Pls.' Am. Compl. Pursuant to Rule 12(b)(1)

("Welch Aff.") (ECF No. 30-1) ¶¶ 6-8.)

    As for the Alliance, Defendants maintain that it also lacks Article III standing to bring

this lawsuit. (Defs.' Mem. at 11-16.) Specifically, Defendants argue that the Alliance does not

enjoy associational standing, because its members do not have standing to sue in their own right

and the litigation would require individualized proof. (Defs.' Mem. at 11-13.) Further

developing their argument that Connell fails to satisfy the injury-in-fact element, Defendants

posit that the Alliance's members merely allege a generalized "fear" that state authorities might

search their property, seize their animals and ultimately impound or euthanize them. (Defs.'

Mem. at 12.) As such, because Connell and other members have not shown an immediate threat

of injury, Defendants conclude that the Alliance cannot establish associational standing. (Defs.'

Mem. at 12.)

In response, Plaintiffs argue that Connell has standing to pursue injunctive relief, because her intended future conduct "is arguably affected with a constitutional interest" and "arguably . . . proscribed by" the Animal Cruelty Statutes. (Pls.' Resp. to Defs.' Mot. to Dismiss the First Am. Compl. Pursuant to Rule 12(b)(1) ("Pls.' Resp.") (ECF No. 29) at 10.) According to Plaintiffs, Connell can satisfy the immediate threat of future injury requirement, because she still operates her business and intends to again own animals in the future. (Pls.' Resp. at 10.) Additionally, Plaintiffs argue that the threat of future legal action against Connell proves substantial, given the history of past enforcement. (Pls.' Resp. at 11-12.) And finally, Plaintiffs argue that Connell can fairly trace her injury to Welch, such that she has standing to pursue money damages. (Pls.' Resp. at 12-13.) On this score, Plaintiffs allege that "Welch ordered the seizure of Connell's animals" and therefore "directly enforced" § 3.2-6569. (Pls.' Resp. at 13.)

Turning to the Alliance, Plaintiffs contend that it enjoys associational standing. (Pls.' Resp. at 13-16.) First, Plaintiffs argue that, because Connell has standing to sue in her own right, the Alliance has satisfied the first prong of the associational standing test enunciated in *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). (Pls.' Resp. at 14.) Next, Plaintiffs argue that participation of individual members would prove minimal. (Pls.' Resp. at 15-16.) Specifically, Plaintiffs maintain that their requests for injunctive and declaratory relief involve pure questions of law, and that their other claims would only require sample testimony from a few members. (Pls.' Resp. at 15-16.)

Defendants filed their Reply on December 28, 2020, (Reply Mem. in Supp. of Defs.' Mot. to Dismiss Pls.' Am. Compl. Pursuant to Rule 12(b)(1) ("Defs.' Reply") (ECF No. 30)), rendering the matter ripe for review.

8

## II.     STANDARD OF REVIEW

A motion made pursuant to Federal Rule of Civil Procedure 12(b)(1) challenges the court's jurisdiction over the subject matter of the complaint.  A defendant moving for dismissal for lack of subject matter jurisdiction may either attack the complaint on its face, asserting that the complaint "fails to allege facts upon which subject matter jurisdiction can be based," or may, as here, attack "the existence of subject matter jurisdiction in fact, quite apart from any pleadings." *White v. CMA Const. Co., Inc.*, 947 F. Supp. 231, 233 (E.D. Va. 1996) (internal citations omitted).  In either case, the plaintiff bears the burden of proof to establish jurisdiction. *Richmond, Fredericksburg & Potomac R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991).  The Court must dismiss an action if it determines that it lacks subject matter jurisdiction. Fed. R. Civ. P. 12(h)(3).

When a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the court applies a standard patterned on Rule 12(b)(6) and assumes the truthfulness of the facts alleged.  *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). "On the other hand, when the defendant challenges the veracity of the facts underpinning subject matter jurisdiction, the trial court may go beyond the complaint, conduct evidentiary proceedings, and resolve the disputed jurisdictional facts." *Id.*

## III.     ANALYSIS

Because Defendants' jurisdictional challenges determine the Court's authority to consider the merits of Defendants' Rule 12(b)(6) Motion, the Court will address those challenges first. *See Docs Billing Sols., LLC v. GENETWORx LLC*, 2018 WL 4390786, at *2 (E.D. Va. Aug. 30, 2018) (noting that jurisdictional challenges — in that case, a motion to remand pursuant to a forum selection clause — should take precedence over other motions (citing *Bartels v. Saber*

9

*Healthcare Grp., LLC*, 880 F.3d 668, 680 (4th Cir. 2018)).  Only if the Court has subject matter jurisdiction will it consider the merits of Defendant's Rule 12(b)(6) Motion.

### A.      Plaintiffs Lack Standing to Pursue Injunctive Relief.

In Counts I, II and III, Plaintiffs allege that Virginia Code §§ 3.2-6568 and 3.2-6569 violate the Eighth and Fourteenth Amendments to the Constitution. (Am. Compl. ¶¶ 91-103.)  In essence, Plaintiffs argue that these statutes deprive citizens of their animals while denying them a pre-deprivation hearing and a meaningful opportunity to appeal a decision from the general district court. (Am. Compl. ¶¶ 91-103.)  As such, Plaintiffs ask this Court to declare the statutes unconstitutional and enjoin Defendants from enforcing them.  (Am. Compl. ¶¶ 91-103.)

In support of their Rule 12(b)(1) Motion, Defendants argue that Plaintiffs lack Article III standing to pursue injunctive relief. (Defs.' Mem. at 7-16.)  Specifically, Defendants parse through the standing analysis for both the individual plaintiff (Connell), and the organizational plaintiff (the Alliance), and conclude that neither can satisfy the applicable standing criteria as set forth by the United States Supreme Court. (Defs.' Mem. at 7-16.)  As to Connell, Defendants argue that she has not adequately shown standing to pursue injunctive relief, because she fails to show that "she is 'immediately in danger of sustaining some direct injury' as the result of any official's challenged conduct." (Defs.' Mem. at 10 (citing *Lyons*, 461 U.S. at 102).)  Indeed, Defendants emphasize that Connell does not presently own any animals on her farm. (Defs.' Mem. at 10 (citing Am. Compl. ¶ 85).)  Instead, Connell alleges that she "intends to again own animals" "[i]n the future." (Am. Compl. ¶ 85.)  And, because the mere act of owning animals does not invoke the statutes at issue, Defendants maintain that Connell has failed to show an injury in fact sufficient to confer standing. (Defs.' Reply at 4-5.)

Additionally, Defendants contend that the Alliance lacks standing. (Defs.' Mem. at 11-13.) Specifically, Defendants argue that the Alliance fails to meet the Article III requirements for associational standing in that members of the Alliance (i.e., Connell) do not have standing to sue in their own right, and that the claims asserted would require individual participation by members of the Alliance. (Defs.' Mem. at 11-13; Defs.' Reply at 6-8.)

In response, Plaintiffs insist that both Connell and the Alliance have standing to bring claims for injunctive relief. (Pls.' Resp. at 8-16.) With respect to Connell, Plaintiffs assert that she enjoys Article III standing, because "(1) her intended future conduct is arguably affected with a constitutional interest and (2) 'arguably . . . proscribed by [the] statute' she wishes to challenge." (Pls.' Resp. at 10 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 160 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979))).) Connell submits that she "intends to again own livestock and other hoofed animals on her farm," but that she nonetheless "cannot do so *but for* governmental intervention." (Pls.' Resp. at 10 (emphasis in original).)

Further, Plaintiffs argue that the Alliance has standing to sue on behalf of its members.[6] (Pls.' Resp. at 16.) Plaintiffs note that they seek declaratory and injunctive relief which raise pure questions of law that "do[ ] not seek to analyze the impact of a statute against the factual context of the case." (Pls.' Resp. at 15.) Moreover, Plaintiffs submit that even if their claims would require individual participation of the Alliance's members, such participation would prove minimal. (Pls.' Resp. at 15.)

---

[6]    Plaintiffs do not argue that the Alliance has standing to sue in its own right. (Pls.' Resp. at 13-16.)

Defendants' assertions that Plaintiff has failed to demonstrate a real or immediate threat of future harm call into question Plaintiff's Article III standing to assert claims for injunctive or declaratory relief. Moreover, Defendants' argument that Connell cannot fairly trace her injury to Welch calls into question Connell's standing to pursue money damages. Therefore, the Court will address those arguments first, because an absence of standing deprives the Court of the power to adjudicate anything further about the claim. *Griffin v. Dep't of Labor Fed. Credit Union*, 293 F. Supp. 3d 576, 578 (E.D. Va. 2018), *aff'd*, 912 F.3d 649 (4th Cir. 2019).

"[F]ederal injunctive relief is an extreme remedy," *Simmons v. Poe*, 47 F.3d 1370, 1382 (4th Cir.1995), and thus an injunction will not issue unless Plaintiffs show a clear right to relief. *Hoepfl v. Barlow*, 906 F. Supp. 317, 320 (E.D. Va. 1995). As part of establishing a clear right to relief, Plaintiffs must first meet the requirements of standing to bring their suit. *Id.*

Article III of the Constitution limits federal courts' jurisdictions to "Cases" and "Controversies." U.S. Const. art. III § 2. To satisfy the case-or-controversy requirement of Article III, Plaintiffs must establish standing to sue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). To meet the minimum constitutional requirements for standing, an individual plaintiff must establish three elements: (1) that the plaintiff has sustained an injury in fact; (2) that the injury is traceable to the defendants' actions; and, (3) that the injury likely can be redressed by a favorable judicial decision. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 629 F.3d 387, 396 (4th Cir. 2011) (citing *Lujan,* 504 U.S. at 560–61). To demonstrate an injury in fact, a plaintiff must suffer an invasion of a legally-protected interest that is concrete and particularized, as well as being actual or imminent. *Gaston Copper Recycling Corp*, 629 F.3d at 396 (citing *Lujan*, 504 U.S. at 560); *McBurney v. Cuccinelli*, 616 F.3d 393, 410 (4th Cir. 2010).

12

### 1.    *Standing Principles for Injunctive Relief*

Where, as here, a plaintiff seeks injunctive relief, a plaintiff must allege a "real and immediate threat" that she will be wronged again. *Bryant v. Cheney*, 924 F.2d 525, 529 (4th Cir. 1991); *see also City of Los Angeles v. Lyons*, 461 U.S. 95, 101–03 (1983) (equitable remedy unavailable absent showing of irreparable injury, which requires sufficient likelihood that plaintiff will again be wronged in a similar way); *Godbey v. Iredell Mem'l Hosp., Inc.*, 2013 WL 4494708, at *4 (W.D.N.C. Aug. 19, 2013) (explaining that to obtain injunctive relief "[a] plaintiff must . . . allege a future encounter with the defendant that is likely to lead to a similar violation of some protected right").

"Standing rules preclude a plaintiff from obtaining injunctive relief based only on events that occurred in the past, even if the past events amounted to a violation of federal law." *Hoepfl,* 906 F. Supp. at 320.  Indeed, "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief." *Lyons,* 461 U.S. at 102 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)).  Absent a "sufficient likelihood that [the plaintiff] will again be wronged in a similar way, [the plaintiff] is no more entitled to an injunction than any other citizen." *Id.* at 111.  Furthermore, the allegation that a plaintiff will suffer a future injury at the hands of a defendant must be non-speculative and must evince more specificity than the future harm will occur "some day." *Lujan*, 504 U.S. at 564.

Relevant here, a plaintiff can satisfy the injury in fact requirement for prospective relief by showing "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder." *Kenny v. Wilson*, 885 F.3d 280, 288 (4th Cir. 2018) (quoting *Babbitt*, 442 U.S. at 298) (internal quotation marks omitted); *see also Am. Fed'n of Gov't Emps. v. Off. of Special Couns.*, __ F.3d

13

__, 2021 WL 2385398, at *4 (4th Cir. June 11, 2021) (citing *Kenny* and articulating same legal standard).[7]  "[I]t is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a statute that he claims deters the exercise of constitutional rights." *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)) (internal quotation marks omitted).  Here, decisional caselaw shows that Plaintiffs fail to demonstrate that Connell intends to "engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute."

In *Kenny*, the plaintiffs, a group of students and a nonprofit organization, filed suit challenging certain state laws as unconstitutionally vague. 885 F.3d at 284.  The statutes, referred to by the court as the "Disturbing Schools Law" and the "Disorderly Conduct Law," broadly criminalized the acts of interfering with or disturbing the students or teachers of any school or college in the state, or of engaging in disorderly or boisterous behavior. *Id.*  According to the plaintiffs, authorities had arrested and charged them with violating the statutes for having engaged in conduct ranging from cursing at another student to simply voicing concerns about racial profiling. *Id.* at 285.  The plaintiffs brought suit under the Fourteenth Amendment, asserting both facial and as-applied vagueness challenges. *Id.*  The plaintiffs alleged that the statutes violated due process, because "they fail[ed] to provide sufficient notice of prohibited conduct and encourage[d] arbitrary and discriminatory enforcement." *Id.* at 285-86.  The plaintiffs further alleged that they feared "future arrest if, while on or around the grounds of a

---

[7]     In its most recent opinion on standing, the Fourth Circuit seemed to confine the applicability of the *Kenny* analysis to First Amendment cases. *See Am. Fed'n of Gov't Emps.*, 2021 WL 2385398, at *4 (prefacing *Kenny* standard with "[i]n cases involving the First Amendment.").  Nonetheless, because the Fourth Circuit did not specifically foreclose the applicability of *Kenny* in other cases (and indeed, the Fourth Circuit has applied *Kenny* in non-First Amendment cases, *Md. Shall Issue v. Hogan*, 963 F.3d 356, 363 (4th Cir. 2020)), the Court will air in Plaintiffs' favor and employ the *Kenny* analysis.

school, their actions are interpreted to fall under any of the broad terms of the statutes." *Id.* at
286.

      In holding that the plaintiffs had standing to seek injunctive and declaratory relief against
enforcement of the statutes, the Fourth Circuit observed that the plaintiffs attended "school
without knowing which of their actions could lead to a criminal conviction, which deprives them
of notice of prohibited conduct and 'may authorize and even encourage arbitrary enforcement' in
violation of their right to due process." *Id.* at 288 (quoting *City of Chicago v. Morales*, 527 U.S.
41, 56 (1999)).  The court emphasized that the school setting "inevitably involves expressive
conduct" and that the statutes restricted the students' ability to "participate in conversations
about policing," which in turn limited the exercise of their First Amendment rights. *Id.*
Accordingly, the plaintiffs had alleged an "intention to engage in a course of conduct arguably
affected with a constitutional interest, but proscribed by [the statutes]."[8] *Id.*

      The Fourth Circuit reached a different result in *Md. Shall Issue v. Hogan*, 963 F.3d 356
(4th Cir. 2020).  There, a gun advocacy group (the "plaintiff") filed suit against the governor of
Maryland challenging the constitutionality of Senate Bill 707 ("SB-707"). *Id.* at 359.  SB-707
made it unlawful for any person to "manufacture, possess, sell, offer to sell, transfer, purchase, or
receive a rapid fire trigger activator," or to "transport" such a device into Maryland. *Id.*  SB-707
defined a "rapid fire trigger activator" as any device that, when installed in or attached to a
firearm, increases the rate at which the trigger is activated, or otherwise increases the rate of fire.
*Id.*  Among other challenges, the plaintiff argued that SB-707 proved unconstitutionally vague,

---

[8]      The court further found that a credible threat of future enforcement existed, because the
plaintiffs "regularly attend schools where they allege there may be future encounters with school
resource officers or other law enforcement; they have been prosecuted under the laws in the past;
and the defendants have not disavowed enforcement if plaintiffs engage in similar conduct in the
future." *Id.* at 289.

because the term "rate of fire" "is 'unintelligible' when applied to semi-automatic and single-action firearms." *Id.* at 363. Because a litany of devices help improve the speed at which a person can fire a gun, the plaintiffs alleged that the statute arguably outlawed devices such as bipods or slings used to stabilize a firearm, or even barrel weights designed to reduce recoil. *Id.* And, given that the plaintiff owned such "potentially banned devices," it claimed to have Article III standing to bring a pre-enforcement attack against SB-707. *Id.* at 363-64.

The court disagreed, and instead held that the plaintiff failed to state an intent to engage in conduct arguably proscribed by SB-707. *Id.* at 363. The Fourth Circuit found that the devices cited by the plaintiff were not arguably proscribed by the statute, because the statute plainly prohibited devices that increased "the rate at which the *firearm* is capable of firing. . . . By contrast, the devices [that the plaintiff] suggest . . . help prepare the *shooter* to fire again more quickly than she may have been able otherwise." *Id.* at 364. Hence, ownership of those devices did not arguably implicate the statute. *Id.*

### 2. *Connell has not shown that she intends to engage in conduct implicated by the statute.*

Here, Connell alleges that she intends to own livestock again in the future. (Pls.' Resp. at 10 (citing Am. Compl. ¶ 85).) But the mere act of owning livestock does not evince an intent to engage in conduct arguably proscribed by a statute. Indeed, the statutes at issue do not prohibit animal ownership. *See* §§ 3.2-3568, 3.2-3569. Instead, they provide a procedural mechanism through which local authorities may investigate and ultimately seize animals which have been abandoned or otherwise mistreated. *Id.* And to be sure, Connell does not allege that she intends to care for livestock in a manner prohibited by the Animal Cruelty Statutes.[9] Rather, she relies

---

[9]     If she did, such conduct likely would not qualify as "affected with a constitutional interest." *Kenny*, 885 F.3d at 288.

on a speculative chain of possibilities that: (a) she will again own animals in the future; (b) her ownership of the animals will come to the attention of local authorities; (c) local authorities will seek a search warrant under § 3.2-6568 to search her property; (d) a magistrate or judge will issue a warrant authorizing a search; and, (e) local authorities will search her property, deem that she has failed to properly care for the animals and seize them according to the procedures outlined in § 3.2-6569. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) (rejecting a standing theory premised on a speculative chain of possibilities).

Given as much, Connell proves unlike the plaintiffs in *Kenny*, who attended school every day under the shadow of an expansive criminal statute that officials could employ against them at any moment for engaging in nearly any form of political expression. Rather, she resembles the plaintiff in *Hogan*, who could not show that its intended conduct arguably implicated the challenged statute. For these reasons, the Court holds that Connell has not adequately alleged an injury in fact, and therefore does not have Article III standing to bring claims for declaratory and injunctive relief.

For these same reasons, the Alliance does not have standing to pursue prospective relief. For an organization to enjoy associational standing, it must show that: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and, (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977). Plaintiffs rely on Connell's standing to bring suit in arguing that they satisfy the first *Hunt* requirement. (Pls.' Resp. at 14.) Therefore, because the Court has determined that Connell does not have standing to bring suit for injunctive and declaratory relief, the Alliance fails to demonstrate that it has associational standing.

17

In resisting this conclusion, Plaintiffs primarily rely on the Supreme Court's decision in *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014). (Pls.' Resp. at 9-12.) However, that case proves inapposite to the standing analysis here.

In *Driehaus*, a state statute criminalized the act of making a false statement concerning the voting record of a candidate or public official. *Susan B. Anthony List*, 573 U.S. at 152. Violation of the statute constituted a first-degree misdemeanor. *Id.* at 153. Petitioner Susan B. Anthony List ("SBA") operated as a pro-life advocacy organization that publicly criticized various Congresspeople who voted for the Patient Protection and Affordable Care Act (the "ACA"). *Id.* In particular, SBA issued a press release claiming that respondent Driehaus, who supported the ACA, voted for "taxpayer-funded abortion." *Id.* at 154. Driehaus filed a complaint with the Elections Commission, alleging that SBA had falsely stated that he voted for taxpayer-funded abortion. *Id.* Shortly thereafter, SBA filed suit in federal district court seeking declaratory and injunctive relief. *Id.* SBA alleged that its speech "had been chilled; that [it] intends to engage in substantially similar activity in the future; and that it face[d] the prospect of its speech and associational rights again being chilled and burdened." *Id.* at 155 (internal quotation marks omitted).

The Supreme Court, in holding that SBA had adequately alleged an Article III injury, found that SBA's intended future conduct proved arguably proscribed by the challenged statute. *Id.* at 162-63. Specifically, the Court observed that the state law swept broadly and covered the subject matter of SBA's intended speech. *Id.* Additionally, SBA alleged that it intended to again disseminate statements regarding its opposition to the ACA, which would directly implicate the challenged statute. *Id.*

18

Plaintiffs' reliance on *Driehaus* proves unavailing.  Unlike SBA, Plaintiffs here have not alleged an intention to engage in conduct that will directly implicate the challenged statutes. Indeed, in *Driehaus*, the mere act of uttering a political opinion created criminal exposure for SBA under the state law.  In this case, however, Plaintiffs have not set forth any allegations that the conduct that they intend to engage in will bring them within the prohibition of the Animal Cruelty Statutes.[10]  Instead, they merely allege that Connell intends to again own animals in the future.

Accordingly, the Court holds that Connell — and by extension, the Alliance — do not have standing to bring a claim for injunctive or declaratory relief.

### B.    Connell Lacks Standing to Bring a Claim for Money Damages.

Next, the Court must consider whether Connell has standing to bring a claim for money damages.  As mentioned, Connell appears to ask for money damages against Welch.[11]  (Am. Compl. at 31; Pls.' Resp. at 13.)  Regarding that claim, Defendants argue that Connell cannot show traceability between the Animal Cruelty Statutes and Welch's alleged misconduct.  (Defs.' Mem. at 11.)  Defendants point out that the Amended Complaint contains only "one vague reference to Welch" as the individual with whom local officials communicated when seizing Connell's animals.  (Defs.' Mem. at 11 (citing Am. Compl. ¶ 69 ("Ms. Connell heard a State official, believed to be Michelle Welch, talking to an officer over his radio, believed to be

---

[10]    The Court also notes that federal courts tend to relax standing requirements for First Amendment claims. *See, e.g.*, *Judson v. Bd. of Supervisors*, 436 F. Supp. 3d 852, 862 (E.D. Va. 2020) (citing *Cooksey v. Futrell*, 721 F.3d 226, 235 (4th Cir. 2013) (citing *Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984))) (observing that, in First Amendment cases, the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship).

[11]    Plaintiffs cannot recover money damages against Herring, because they bring suit against him in his official capacity.  (Am. Compl. ¶ 14.)  As such, the Eleventh Amendment would bar a claim for damages. *Bland v. Roberts*, 730 F.3d 368, 390-91 (4th Cir. 2013).

Officer Green.  The State official was irate and demanded that Officer Green seize the animals

on the property.").)  Moreover, Defendants supply an affidavit from Welch in which she admits

that she communicated with Sergeant Green regarding the animals on Connell's farm and that

she "indicated that it sounded like an animal abuse situation." (Welch Aff. ¶ 3.)  However,

Welch denies that she instigated the investigation or that she played any part in directing or

ordering the seizure of Connell's animals.  (Welch Aff. ¶¶ 5-13.)  Conversely, Plaintiffs insist

that "Welch ordered the seizure of Connell's animals" and therefore "directly enforced [§] 3.2-

6569." (Pls.' Resp. at 13.)

As mentioned, traceability constitutes one of the three elements of Article III standing

that a plaintiff must demonstrate to bring suit in federal court. *Lujan*, 504 U.S. at 560.

Specifically, "there must be a causal connection between the injury and the conduct complained

of — the injury has to be 'fairly . . . trace[able] to the challenged action of the defendant, and not

. . . the result [of] the independent action of some third party not before the court.'" *Id.*  The

traceability requirement does not mean that a plaintiff "must prove to an absolute certainty that

the defendant's actions caused or are likely to cause injury; rather the 'plaintiffs need only show

that there is a substantial likelihood that defendant's conduct caused plaintiffs' harm.'" *NC*

*RSOL v. Boone*, 402 F. Supp. 3d 240, 249 (M.D.N.C. 2019) (quoting *Pub. Interest Research*

*Grp. of NJ, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 72 (3d Cir. 1990) (quoting *Duke*

*Power Co. v. Carolina Env't Study Grp.*, Inc., 438 U.S. 59, 75 n.20 (1978))).  Indeed, the

defendant's actions need not "[be] the very last step in the chain of causation." *Bennett v. Spear*,

520 U.S. 154, 168-69 (1997).  Rather, a plaintiff can show traceability where the injury suffered

is "produced by [the] determinative or coercive effect" of the defendant's conduct "upon the

action of someone else." *Id.* at 169.

Here, the parties maintain a factual dispute over the extent to which Welch participated in the seizure of Connell's animals. Moreover, because that dispute proves relevant to the traceability analysis, it bears directly on whether this Court has subject matter jurisdiction to adjudicate Connell's claim for money damages. As such, on June 4, 2021, the Court held an evidentiary hearing, pursuant to *Kerns v. United States*, on the limited factual question of whether Welch played a "determinative or coercive" role in the search and seizure of Connell's animals. 585 F.3d 187, 193 (4th Cir. 2009). Welch testified during the hearing and the Court finds Welch credible as a matter of fact, as Plaintiffs offered no evidence to contradict her testimony.

Specifically, the Court finds that Welch did not direct or order the search of Connell's property nor the seizure of her animals. Indeed, Welch testified that Officer Green had already procured a search warrant for the property before he contacted Welch. Further, after Officer Green contacted Welch, she advised him that he should wait for the veterinarian on site to finish the evaluation of the animals before seizing them. And, Welch denied giving any direction to Officer Green in any manner, instead telling him that he needed to consult with the Commonwealth's Attorney. Moreover, Plaintiffs offered no additional evidence to show Welch's allegedly determinative or coercive role in the seizure of Connell's animals. Plaintiffs did not, for instance, call Connell or Officer Green to testify as to the events of that day. Accordingly, Welch's testimony that she did not order or direct the seizure of Connell's animals stands uncontested. And, critically, her testimony fails to demonstrate that she played a determinative or coercive role in the search of Connell's property or the seizure of her animals.

Welch's testimony showed that local authorities exercised their independent judgment in seizing the animals. Thus, Welch did not play a "determinative or coercive" role in influencing

21

the actions of the local officials to search and/or seize Connell's animals.  Given as much, Connell cannot fairly trace her injury to Welch, and she therefore lacks Article III standing to bring a claim for money damages.

For these reasons, Plaintiffs do not have standing to bring claims for injunctive/declaratory relief or money damages; therefore, the Court lacks jurisdiction over this action.

## IV.    CONCLUSION

For the reasons set forth above, the Court hereby GRANTS Defendants' Rule 12(b)(1) Motion (ECF No. 19) and DISMISSES WITHOUT PREJUDICE Plaintiff's Amended Complaint (ECF No. 13).  Accordingly, the Court DENIES WITHOUT PREJUDICE Defendants' Rule 12(b)(6) Motion (ECF No. 23).

An appropriate Order shall issue.

Let the Clerk file a copy of this Memorandum Opinion electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date: June 14, 2021